**J. TOM WATSON, as Attorney General for the State of Florida, v. SPESSARD L. HOLLAND, as Governor of the State of Florida, J. M. LEE, as Comptroller of the State of Florida, J. EDWIN LARSON, as Treasurer of the State of Florida, and NATHAN MAYO, as Commissioner of Agriculture of the State of Florida, and the said HOLLAND, LEE, LARSON, and MAYO, as members of and collectively constituting as a majority of the Trustees of the Internal Improvement Fund of the State of Florida, and ARNOLD OIL EXPLORATIONS, INC., a Florida Corporation.**

20 So. (2nd) 388
December 19, 1944
Rehearing denied January 31, 1945

June Term, 1944
En Banc

*J. Tom Watson,* Attorney General, and *George M. Powell, R. W. Erwin, Jr.,* Assistant Attorneys General, and *Cecil T. Farrington,* Special Assistant Attorney General, for appellant.

*K. I. McKay, W. H. Jackson, McKay, Macfarlane, Jackson & Ferguson, R. F. McGuire, J. R. Wells, Maguire, Voorhis & Wells* and *J. Turner Butler,* for appellees.

HUTCHINSON, Circuit Judge:

This is an appeal from the chancellor's order sustaining a motion to dismiss and a final decree entered, on dismissal of the amended bill of complaint.

The amended bill of complaint, sets out the official status and relation of the parties.

The prayers in the amended bill of complaint are for relief by injunction and for cancellation and recission of the lease as described in the bill of complaint.

The leases is shown by the proceedings in the lower court to have been executed on May 13, 1944, subsequent to the execution of the exploration contract, executed February 2, 1942, referred to in paragraph 8 of the amended bill of com-

plaint, the salient provisions of which are set forth in the amended bill, as follows:

"In consideration of the execution of this contract by the Trustees, the Lessee agrees, within two (2) months from the date hereof, to commence the making of such geological and geophysical surveys of the described areas as will determine the formation and structure thereof, and make and keep comprehensive notes, memoranda, maps, plats, profiles, samples of deposits, cuttings and cores of the results of such explorations and surveys. When Lessee commences exploration of any unit or units under the terms of this contract, it shall immediately furnish the trustees a description of each unit on which the exploration is so commenced, and shall within ten (10) days after the first day of each month, thereafter, until the exploration as contemplated under this contract of such designated unit is completed, make a report to the trustees advising them of the progress of the work of exploration on such unit or units. When the surveys and investigation of exploration as contemplated by this contract shall have been completed as to any unit or units, the Lessee shall immediately make up tentative maps, plats and profiles showing the results of the exploration of such unit or units and shall transmit a copy thereof, together with a copy of the pertinent exploration and explanatory notes made and kept of such exploration work, and also samples of all cuttings, cores or deposits taken and kept by lessee to the trustees for inspection by them. This data and information shall be deemed to be the property of the lessee and not subject to inspection by anyone except the trustees or their regular employees, until sixty (60) days after expiration of this exploration contract, at which time the same shall become a public record. Within ninety (90) days after the expiration of this contract the lessee shall furnish to the trustees to become a permanent State record, a complete record of the result of the exploration of the described areas with maps, plats and profiles thereof, together with such samples of cuttings, cores and deposits which may be pertinent to such report. At any time after any information is furnished trustees by lessee, the trustees shall have the right to inspect,

or have inspected, the work of such lessee, and to check such information and the source and basis therefor."

The bill of complaint is predicated upon three principal contentions, viz:

1.   That the trustees of the Internal Improvement Fund have no authority under the Constitution and laws of Florida to execute oil leases on sovereignty lands of the State.

2.   That even if the trustees of the Internal Improvement Fund have authority to execute oil leases, on such lands, they have no authority to do so without advertising for bids.

3.   That the lease issued to the respondent Arnold Explorations, Inc., should be rescinded because of the alleged breach of the contract of explorations, made prior to the execution of the lease.

The first of these contentions is without merit.

The case of Pembroke v. Peninsular Terminal Company, 108 Fla. 46, 146 So. 249, reviews te previous Florida Cases on this point and states:

"The first contention of the appellant is that Section 1391 and 1392, Compiled General Laws, derived from an Act adopted in 1917, are void by reason of being (1) unconstitutional and (2) in conflict with the trust doctrine frequently enunciated by this Court, citing Broward v. Mabry, 58 Fla. 398, 50 So. 826; State v. Gerbing, 56 Fla. 603, 47 So. 353, 22 L.R.A. (N.S.) 337; Merrill Stevens Co. v. Durkee, 62 Fla. 549, 57 So. 428; Dearing v. Martin, 95 Fla. 224, 116 So. 54, 64. These two questions are somewhat interrelated in appellant's brief and may be considered in connection with each other.

"Those sections of the Act of 1917 here under attack are set forth in the Compiled General Laws of 1927 (Sections 1391, 1392) and are also copied in full in the opinion written for this Court by Circuit Judge Campbell in the case of Deering v. Martin, on pages 229, 230 of 95 Fla., and on page 57 of 116 So. _____

"So far as the Constitution of this State is concerned, as was pointed out by this Court, speaking through the majority opinion written by Mr. Justice ELLIS in the case of State ex rel. Buford v. City of Tampa, 88 Fla. 196, 102 So. 336.

"There is no provision in the Constitution of this State expressly or impliedly forbidding the Legislature to dispose of submerged lands lying between high and low water mark, nor declaring any trust in the State in its tidewater, nor the submerged lands that may be subject to overflow at high tide." This case was followed in the recent case of Tampa Northern R. Co. v. City of Tampa (Fla.) 140 So. 311, decided March 17, 1932, wherein the special act granting the fee simple title to the city of Tampa in certain submerged lands in Hillsborough Bay and Hillsborough River, which was held valid in the case above quoted from was again brought in question. These cases would seem to be conclusive of the question of the constitutionality of the statute so far as the State Constitution is concerned. . . ."

"In Deering v. Martin, supra, it was held that the trust doctrine, with reference to lands under navigable waters, cannot on principle, be carried to such an extent as to preclude the State from transferring to private ownership limited portions of such lands when the rights of the people of the State are not invaded or impaired. . . .

"In discussing this question, this Court in Deering v. Martin, supra, said:

" 'Section 1062 indicates that the power vested by Section 1061 should not be exercised on objection made when it would interfere "with the rights granted to riparian owners by the laws of Florida, or would be a serious impediment to navigation or public fisheries." In such a case, no doubt, the board should decline to sell, even in the absence of formal objection.

" 'It is not my purpose to contend that the trust doctrine with reference to lands under navigable waters in this State, would preclude the State from transferring to private ownership limited portions of such lands when the rights of the people of the State for which the State holds the title in trust are not invaded or impaired. And such must have been the intent of the statute. This principle is recognized by our decisions, including those cited in Judge Campbell's opinion. . . .' . . .

"To sum up, the general principle, supported by the

weight of authority in this country, is that, subject to the paramount authority of Congress over interstate commerce and the navigable waters of the United States, and subject also to vested private property rights, a state has full power to legislate concerning the disposition and use of navigable waters and the lands thereunder which are within the territorial limits of the State, even where such waters connect with waters outside such limits; subject to any prohibitions or limitations upon the exercise of such power which may be contained in the State Constitution. . . . These acts, together with the act here under attack, evidence a public policy established under legislative authority, beginning as far back as 1856, under which the State may part with the title to certain portions of its lands under navigable waters, of the kind and under the conditions described in the statutes, which policy and authority cannot be lightly disregarded by the courts. . . .

"Our conclusion therefore, is that Chapter 7304 of the Acts of 1917 (Section 1391 et seq., Comp. Gen. Laws) is a valid act, and is not in conflict with the State or Federal Constitutions, nor with the Congressional Act of March 3, 1899 (Sections 9 and 10 Sec. 33 USCA Sec. 401, 403), nor with the trust under which the State holds the title to lands under navigable waters."

This case was followed in 1940 by the case of Caples v. Taliaferro, 144 Fla. 1, 197 So. 861, text 864, from which we quote as follows:

"It may be regarded as settled that title to all submerged lands whether tide or fresh is held by the states in trust for all the people of the respective states, that such trust is governmental and may not be completely alienated but that in the interest of all the people, the States may grant to individuals limited privileges or rights in such lands."

Other authorities along the same line are:

"The primary uses of most of the beaches have always been bathing, recreation, fishing and navigation . . . The Sovereign state may in the interest of the general welfare authorize the beach or shore to be appropriately used as a public highway. . . . However, we are of the opinion that

such an authorization for highway uses must be subject to a reasonable use of the beach or shore for its primary and long established public purposes, for which the State holds it in trust, and subject to lawful governmental regulations." White v. Hughes, 139 Fla. 54, 190 So. 446.

"While the foreshore or beach on the ocean is held by the Sovereign in trust for the public primarily for purposes of navigation, commerce, fishing, and bathing, such beach or foreshore is also held in trust for other purposes authorized by law when the first mentioned primary purposes are not excluded or unduly abridged or burdened." Adams v. Elliott, 128 Fla. 79, 174 So. 731.

"The trust doctrine has been before this Court so many times that it is entirely unnecessary to go outside the State for authorities dealing with the authority in general of the State Legislature over submerged lands. There is, however, no case in Florida dealing with the particular subject of oil leases in its relation to the trust doctrine. In view of that fact, we feel that the case of Boone v. Kingsbury, 206 Cal. 148, 273 P. 797, will undoubtedly be of considerable interest, dealing as it does not only with the trust doctrine but with the specific question of the relationship of oil leases to the trust doctrine and the fact that the trust doctrine is not violated by the entering into contracts, by the State of oil leases."

The California Court cites with approval two decisions of this Court, rendered, in an able opinion, by Chief Justice Raney, viz: State v. Board of Phosphate Commission, 31 Fla. 558, 12 So. 913; State v. Black River Phosphate Co., 32 Fla. 82, 13 So. 640, 21 L.R.A. 189, and also the very able opinion written by Justice WHITFIELD, in State v. Gerbing, 56 Fla. 603, 47 So. 353, 22 L.R.A. (N.S.) 337.

The second contention is based upon Section 270.07 Fla. Statutes 1941, which reads as follows:

"No lands in the State of Florida that are now, or may hereafter be, vested in the trustees of the Internal Improvement Fund of the State of Florida, or the State Board of Education of the State of Florida, shall be sold, conveyed or disposed of by the said trustees or by the said Board of

Education until notice by publication shall have been given for the full term of thirty days prior to such sale; provided, that this section shall not apply to homestead, railroad or canal grants, as now provided for by law."

The Statute deals with lands of the State which ". . . shall be sold, conveyed or disposed of. . . ." Obviously, with respect to the lands to which the Statute refers, the State would unconditionally part with title, whereas Chapter 20680 of the Laws of 1941 (Section 270.28 F.S. 1941) deals not at all with the disposition of the title to the property but the granting of a limited right to take from the lands or water bottoms owned by the State, certain substances, namely, oil and gas, pursuant to a lease, the terms of which lease said Chapter 20680 expressly limits, as do other statutes of the State of Florida.

A brief review of the history of these Statutes seems appropriate.

Section 270.07, F.S. 1941, orginated from Section 1 of Chapter 5943 of the Laws of 1909, being "An Act to provide for the sale of lands that are now, or may hereafter be vested in the trustees of the Internal Improvement Fund of the State of Florida, and the State Board of Education of the State of Florida." Such Chapter not only contemplated the advertisement of lands to be so sold, conveyed or disposed of, but also that such lands should be sold to the highest bidder upon sealed bids not to be opened until the day of sale provided in the advertisement, at which time all such bids should be opened in the presence of the trustees of the Internal Improvement Fund if they were making the sale, or in the presence of the State Board of Education if it were making the sale. The Legislature was then dealing with the general subject or disposing of the fee simple title to its lands just as it was when in Chapter 6159, Acts of 1911 (see Section 270.11 F.S. 1941) it was dealing with the subject of reserving for the benefit of the people of this State "an undivided one-half interest in, and title in and to, an undivided one-half interest in all the petroleum that may be in, on, or under the said above described lands; . . .", referring to the contracts for sale and deeds for the sale of lands that might

thereafter be executed by the trustees of the Internal Improvement Fund of the State of Florida and the State Board of Education of the State of Florida.

"In 1923 the Legislature began to deal with the narrower and more limited subject, special in its nature, the protection and disposition of the oil and gas resources of this State with respect to any lands owned or controlled by the State of Florida, and when it did so by Chapter 9289 (now carried forward in part by Section 253.45 F.S. 1941) it authorized the trustees of the Internal Improvement Fund of Florida ". . . to sell or lease on such terms as they may deem advisable for oil, gas or mineral purposes the right, title or interest in and to any lands owned or controlled by the State of Florida including Sovereignty lands; . . ."

The legislative Act of 1927, Chapter 12429 (see Section 253.47 F.S. 1941) is even more limited in its scope than the 1923 Act just referred to in that it authorized and empowered the trustees of the Internal Improvement Fund ". . . to lease for royalties or for other agreed compensation, or to sell and otherwise dispose of, to persons, firms or corporations the right to drill wells for the discovery and/or the production of petroleum and/or natural gas in the bottoms owned by the State of Florida in its sovereign capacity. . . ; provided that such leases or sales shall not confer upon the person, firm or corporation acquiring the same right to enter upon any private property of another, nor the right to drill any well or otherwise place permanent or stationary obstruction in such waters or upon such bottoms within one-quarter of one mile of the shoreline of the lands of any upland owner without first having the written consent of such upland owner so to do. . . ."

One thing is certain: the Legislature was not here dealing with the subject of selling, conveying and disposing of water bottoms, but only with the leasing and disposition of substances which it hoped might be derived from such water bottoms for the benefit of all the people of this State.

The Legislature in 1941 in the enactment of Chapter 20680 (270.28 F.S. 1941) was again dealing with the narrow and restricted subject of leasing oil, gas and other mineral

rights lying in or under lands or water bottoms in this State and by said Chapter it authorized the Board of Trustees of the Internal Improvement Fund and the Board of Commissioners of the State institutions and the State Board of Education, and each of them, ". . . to negotiate, sell and convey leasehold estates, and to make, execute, and deliver lease contracts commonly known as petroleum oil and gas leases, to any person, firm or corporation authorized to do business in the State of Florida, thereby granting such persons all right usually conveyed by petroleum oil and gas leases as to any lands or water bottoms the legal title to which is vested by law or otherwise in such Board or Boards, on such terms and conditions as may be agreed upon between the State Board executing the lease and lessee named in the lease." Here again the subject matter of the legislation was not all the sale, conveyance and disposition of the title to lands; the object in view was to retain the title to the lands and water bottoms, and to utilize to the advantage of all the people of Florida certain substances and minerals which it was hoped might be found within such lands and water bottoms so owned by the State of Florida.

"The fundamental rule of construction is to ascertain and give effect to the intention of the Legislature as expressed in the statutes." Burr v. Florida East Coast Ry. Co., 81 So. 464, 77 Fla. 259. Florida Digest, Title Statutes 181(1).

"The intent of a valid statute is the law and this is ascertained by a consideration of the language and purpose of the enactment." State ex rel. Triay v. Burr, 79 Fla. 290, 84 So. 61; State v. Beardsley, 94 So. 660, 84 Fla. 109.

"In seeking legislative intent, by tracing history of legislation, it is proper to consider acts passed at prior or subsequent sessions, including those repealed, as well as those passed at the same session." Amos v. Conkling, 126 So. 283, 99 Fla. 206. Headnote 11, Florida Digest Title Statutes 217.

A mere consideration of the history, purpose and intent of the Legislature demonstrates that the leasing of lands and water bottoms for the highly specialized purpose of producing oil, gas and other minerals as contemplated by Section

270.28 F.S. 1941, is a thing separate, distinct and apart from the sale, conveyance and disposition of the fee simple title to lands contemplated in Section 270.07 F.S. 1941.

The directions of the Legislature to the Board in question, to negotiate oil and gas leases on such terms and conditions as may be agreed upon between the State Board in question and the Lessee named in the lease demonstrates that the Legislature neither expected nor intended that anyone should seek to apply the terms of Section 270.07 to such negotiation and to such agreements."

To negotiate, as here used, means to discuss or arrange a business transaction. Black's Law Dictionary Deluxe Third Edition.

Section 270.07 F.S. 1941, which has reference to lands "sold, conveyed or disposed of" has no application to Section 270.28 F.S. 1941, which deals with the authority to negotiate lease contracts for the discovery and the production of oil and gas and other minerals.

Section 270.28 is special legislation the provisions of which must be given effect as against the more general provisions of Section 270.07. The former imposes a very broad discretion upon the trustees with reference to oil leasing and imposes a legislative mandate upon the trustees to encourage by lawful and reasonable means the explorations for petroleum oil and natural gas upon lands, both upland and submerged, title to which is invested in said Board. The word "negotiate" as used is a very broad and comprehensive term which is wholly inconsistent with the limitations and restrictions imposed by the law of competitive bidding; the term implies the power to bargain and consummate a transaction. Dade City v. City of Miami, 77 Fla. 786, 82 So. 384. Kepner v. United States, 195 U. S. 100, 49 Law Ed. 114.

As to the third contention, the non-performance of the exploration contract, affords no grounds for cancellation or rescission of the lease subsequently made. The amended bill of complaint charges no fraud, misrepresentation of fact, or mistake, in the execution of the lease, but merely relies on the non-performance of the so-called exploration agreement made long before the lease was executed.

It is further urged in the amended bill of complaint as a ground for relief, that the drilling of oil wells will pollute the waters and thereby create a nuisance. Upon this conclusion of the pleader, relief is prayed by injunction.

This is negatived by the terms of the lease which provide safeguards against such objectionable operations of the wells, if and when drilled.

In the case of National Container Corporation, et al., v. State ex rel. 138 Fla. 33, we said that "we may safely say that there is no place in Florida suitable or usable as a location for a wood pulp mill where smoke, gases and noxious odors emitted from the mill would not be disagreeable, annoying and obnoxious to some citizens of Florida." We said further: "A statute may be effective to take a thing out of the class of public nuisances" . . .. Oil wells properly operated have been lifted out of the class of public nuisances by the representatives of the people through legislative enactment.

The decree of the chancellor, moreover, provides that it is without prejudice, however, to any citizen of the State of Florida or any other aggrieved party to subsequently bring an action for redress on account of any violation, statutory, common law or constitutional rights with reference to any operation, conduct or activity pursuant to or under said lease, and without prejudice to the Attorney General or any other appropriate board or instrumentality of the State of Florida to subsequently institute an action for damages, if any, occasioned by virtue of any breach of the exploratory contract, mentioned in the bill of complaint.

For the reasons pointed out, the decree of the chancellor, dismissing the amended bill of complaint, should be and is hereby affirmed.

TERRELL, BROWN, CHAPMAN, THOMAS and SEBRING, JJ., and MURPHREE, Circuit Judge, concur.

BUFORD, C. J., disqualified.

ADAMS, J., not participating.